**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **ULTIMAX, INC., et al.,** | : | |
| Plaintiffs, | : | Case No. 2:06-cv-951 |
| v. | : | Judge Holschuh |
| **MERCEDES-BENZ USA, LLC,** | : | Magistrate Judge King |
| Defendant. | : | |
| | : | |

**MEMORANDUM OPINION & ORDER**

Ultimax, Inc. and its President and sole employee, Magdy Abulella ("Plaintiff") brought this suit against Mercedes-Benz USA, LLC ("Defendant") to rescind or, in the alternative, to recover damages for, Plaintiff's purchase of an allegedly defective vehicle. Plaintiff alleges breaches of express and implied warranties, and violations of Ohio's Consumer Sales Practices Act, Nonconforming New Motor Vehicle Law, and Deceptive Trade Practices Act, as well as a violation of the federal Magnuson-Moss Warranty Act. This matter is currently before the Court on Defendant's Motion for Summary Judgment. (R. at 17.) For the following reasons, Defendant's Motion is **GRANTED** in part and **DENIED** in part.

**I.    Background**

In late March 2006 Plaintiff purchased a new 2007 Mercedes-Benz S550 (the "Vehicle") from Germain Mercedes-Benz of Columbus ("Germain"), an authorized Mercedes-Benz distributor. (Compl. ¶ 1, R. at 3.) The Vehicle was delivered on April 3, 2006. (Dep. Magdy Abulella p. 11, R. at 16-2 ("Abulella Dep.").) Plaintiff states that he did no research or investigation into the Vehicle's specifications before purchasing it, and did not test-drive the Vehicle. Plaintiff states that

he purchased it simply because it was a Mercedes-Benz, which he associated with luxury and comfort. (Id. p. 12-14.)  Plaintiff's company, Ultimax, Inc., is listed on the purchase order and Plaintiff considers the Vehicle a business vehicle. Plaintiff uses the Vehicle for personal use as well, but deducts his personal use of the Vehicle on Ultimax's tax returns. (Id. p. 16-17.)  Plaintiff states that he wanted a vehicle he could enjoy driving, usually as a treat to himself after work. (Id. p. 48-49.)  When Plaintiff purchased the Vehicle, Defendant issued him a written warranty, which warranted against defects in the Vehicle's workmanship or parts. (Pl. Mem. Opp'n. p. 6, R. at 23.)

The first time that Plaintiff drove the Vehicle on the highway, he noticed a vibration. This vibration, which Plaintiff describes as "substantial," could be felt in the steering wheel and the driver's seat when the car traveled at highway speeds. (Id. p. 24-25.)  Plaintiff's expert witness, Gerald Smolak, also testified that the vibration was "very noticeable" and that it left his fingers feeling numb and tingly. (Gerald Smolak Dep. p. 30-32, R. at 16-3.)  The vibration never affected the Vehicle's driveability, though, as the Vehicle would always take Plaintiff from point A to point B and never broke down.  Despite the vibration, Plaintiff did not immediately take the Vehicle to Germain for repairs, but instead elected to wait until the regularly scheduled 1,500 mile maintenance visit.  Plaintiff assumed that the vibration was a minor issue that could be easily resolved. (Id. p. 24.)

Plaintiff took the Vehicle to Germain for the 1,500 mile maintenance visit on May 30, 2006. (Repair Order, Def. Mot. Summ. J. ex. B, R. at 17.)  Plaintiff told the service representatives about the vibration, and a work order indicates that Germain technicians verified the existence of the vibration. (Id.)  The technicians rotated and balanced the tires, and a test drive indicated that the vibration was gone. (Id.)  Plaintiff disagrees, however, and states that when the Vehicle was

returned to him on the same day, the vibration was actually worse. (Abulella Dep. p. 27.) Plaintiff returned the Vehicle to Germain a week later, on June 6, 2006, and complained of the same vibration. (Repair Order, Def. Mot. Summ. J. ex. C, R. at 17.) Edward Kyser, a Germain technician, road tested Plaintiff's Vehicle and confirmed that the vibration was still present. (Edward Kyser Dep. p. 12, R. at 24-2.) Contrary to Plaintiff's description, Kyser described the vibration as "light," and stated that he felt it only in the seat, not in the steering wheel. (Id. p. 15, 22.) Kyser stated that other Mercedes-Benz S550s had this vibration, and while he believed that it could be eliminated, he did not necessarily believe that the vibration constituted a problem or defect with the Vehicle because it could be a normal characteristic of the S550 model. (Id. p. 21-23.) Following Kyser's road test, Germain technicians put new tires on the Vehicle, balanced the tires again, and reset the engine mounts. (Repair Order, Def. Mot. Summ. J. ex. C., R. at 17.) There was no change in the vibration, however. (Id.) Rocky Nastase ("Nastase"), Germain's service manager, contacted one of Defendant's technical representatives, Dave Price, who told Germain to replace the drive shaft center support bearing. (Rocky Nastase Dep. p. 27, R. at 24-2 ("Nastase Dep.").) Plaintiff picked up the Vehicle on June 19, 2006, and stated that the vibration was still present. (Abulella Dep. p. 29.)

Plaintiff returned to Germain on June 28, 2006 for the third time. He stated that the vibration in the Vehicle was still present, and also complained of a howling noise coming from the car when it traveled at 40 mph with the air conditioning on. (Repair Order, Def. Mot. Summ. J. ex. D, R. at 17.) Nastase contacted Leon Romans ("Romans"), one of Defendant's technical specialists, and arranged for Romans to come to Germain and test Plaintiff's Vehicle. (Leon Romans Dep. p. 15,

3

R. at 16-4 ("Romans Dep.").) Romans test drove the Vehicle and used an accelerometer[1] to get an objective assessment of the vibration. After driving Plaintiff's Vehicle and comparing the accelerometer readings to another S550 that he test drove the same day, Romans concluded that the vibration Plaintiff complained of was a normal characteristic of the Vehicle. (Id. p. 27-28, 41.) Romans had also noted this vibration in other S550s that he had driven previously, and stated that the vibration in Plaintiff's Vehicle was similar to the vibrations he had noticed in other S550s. (Id. p. 34.) Romans did not believe that the vibration was a defect in the Vehicle. (Id. p. 41.) Plaintiff picked up the Vehicle on July 11, 2006. (Abulella Dep. p. 31.)

Plaintiff, however, was still unhappy with the vibration as well as the howling noise, and took the Vehicle back to Germain on July 18, 2006. (Repair Order, Def. Mot. Summ. J. ex. E, R. at 17.) Germain technicians identified the source of the howling noise as a faulty condenser that was leaking freon, and replaced the condenser. (Nastase Dep. p. 18.) Plaintiff testified that this fixed the howling noise, and he has had no further complaints about it. (Abulella Dep. p. 36-37.) As for Plaintiff's vibration complaint, Germain again replaced the tires and road force balanced the tires.[2] (Repair Order, Def. Mot. Summ. J. ex. E, R. at 17.) Nastase states that he believed that all problems with the vibration were resolved, and that when he test drove the Vehicle with Plaintiff after this

---

[1] An accelerometer is a small sensor, approximately the size of a quarter, that magnetically attaches to the passenger seat frame rail, a rigid, steady rail bolted to the Vehicle's frame. The accelerometer measures the frequency of any vibration in the Vehicle and can indicate whether a vibration comes from the tires, the engine, or other parts of a vehicle. Accelerometers are commonly used in the automotive engineering industry. (Romans Dep. p. 22-25.)

[2] "Road force balancing" is a procedure, commonly used in the automotive engineering industry, in which the wheels and tires are balanced while a machine simulates the weight of the vehicle on the wheels and tires. (Smolak Aff. ¶ 29.)

work was done "it drove like any other vehicle of that sort." (Nastase Dep. p. 37.) Plaintiff disagrees, and states that when he and Nastase test drove the Vehicle, Plaintiff again complained about the Vehicle's vibration. Plaintiff says that Nastase said he felt it and apologized for not fixing the problem. (Abulella Aff. ¶ 21, Pl. Mem. Opp'n ex. A., R. at 23.) Nastase denies ever making this statement, and stated at his deposition that the vibration was normal for an S550 and that the Vehicle was fixed. (Nastase Dep. p. 43.)

The Vehicle was returned to Plaintiff on August 15, 2006, and in late August Plaintiff had several conversations with Defendant regarding the Vehicle. (Abulella Dep. p. 44-45.) During this time period, Plaintiff test drove at least three other Mercedes-Benz S550s, and felt the same vibration in each S550 he test drove. (Id. p. 45-47.) Nevertheless, on September 7, 2006 Plaintiff sent a letter to Defendant stating that he revoked his acceptance of the Vehicle and rescinded the sale. (Compl. ex. B, R. at 3.) Defendant did not accept Plaintiff's attempted revocation and rescission, and on October 2, 2006 Plaintiff filed his Complaint against Defendant in Franklin County Common Pleas Court. (Notice of Removal ¶ 1, R. at 2.) Defendant removed the case to this Court on November 13, 2006 (id.), and answered Plaintiff's Complaint on November 15, 2006. (R. at 6.) After a sufficient period of discovery, Defendant filed a Motion for Summary Judgment on December 5, 2007. (R. at 17.) Plaintiff responded on January 7, 2007 (R. at 23), and Defendant replied on January 18, 2007. (R. at 25.) The issues are now ripe for adjudication. The Court has subject-matter jurisdiction pursuant to 18 U.S.C. §§ 1331 and 1332(a).

**II.     Standard for Granting Summary Judgment**

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of

5

every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c). Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right to trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any

6

"unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

FED. R. CIV. P. 56(e).

7

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

**III.    Analysis**

    **A.    Nonconforming New Motor Vehicle Law**

Ohio's Nonconforming New Motor Vehicle Law, OHIO REV. CODE ANN. §§ 1345.71-1345.78 (LexisNexis 2006), "is designed to protect consumers from chronically defective new automobiles. It requires new vehicles to live up to the warranties given by manufacturers." Royster v. Toyota Motor Sales, 92 Ohio St. 3d 327, 328, 750 N.E.2d 531 (2001). Section 1345.72(A) requires a manufacturer to make any repairs that are necessary to correct any defects, reported during the first year of ownership or first 18,000 miles of operation, that make a vehicle not conform to the manufacturer's written warranty. Section 1345.72(B) provides consumers with a remedy to enforce the obligation created in § 1345.72(A), and provides:

> If the manufacturer, its agent, or its authorized dealer is unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any nonconformity after a reasonable number of repair attempts, the manufacturer . . . either shall replace the motor vehicle with a new motor vehicle acceptable to the consumer or shall accept return of the vehicle from the consumer and refund [the purchase price and incidental damages.]

R.C. § 1345.72(B). "Nonconformity" is defined as "any defect or condition that substantially

impairs the use, value, or safety of a motor vehicle to the consumer and does not conform to the express warranty of the manufacturer." R.C. § 1345.71(E). Section 1345.73 limits "reasonable number of repair attempts" to, inter alia, attempting to repair the same nonconformity three or more times during the first year of ownership or 18,000 miles of operation, or subjecting the vehicle to repair for a total of 30 days or more during the first year of ownership or 18,000 miles of operation. To properly state a claim under § 1345.72(B), then, a plaintiff must prove that 1) he or she purchased a vehicle with a written warranty; 2) nonconformities exist that make the vehicle not conform to the written warranty; 3) he or she reported the nonconformities to the manufacturer; and 4) the manufacturer could not correct the nonconformities after a reasonable number of repair attempts. See, e.g., Iams v. DaimlerChrysler Corp., __ N.E.2d __, __, No. 6-07-08, 2007 WL 4373237 *2 (Ohio App. 3d Dist. Dec. 17, 2007).

     Defendant argues that Plaintiff cannot establish the existence of a nonconformity in the Vehicle, because he only complains about the vibration. (Def. Mot. Summ. J. p. 8, R. at 17.) Plaintiff testified that the vibration did not impair the Vehicle's function, in that it "takes [him] from point A to point B[,]" but that it impaired the purpose for which he bought the Vehicle, which was to have a nice vehicle to drive. (Abulella Dep. p. 48-49.) Defendant argues that, without impairing the mechanical function or other aspects of the Vehicle, a vibration alone cannot constitute a nonconformity and relies on Miller v. DaimlerChrysler Motors Corp., No. 78300, 2001 WL 587496 (Ohio App. 8th Dist. May 31, 2001). The plaintiff in Miller complained of intermittent vibrations and noise in the steering column of his Jeep, which the defendant was unable to correct. The Miller court upheld a directed verdict for the defendant, however, because the plaintiff did not introduce any evidence that the vibrations affected other components of the vehicle, such as the engine or drive

train. Id. at *4. Without connecting the vibration to other evidence of a functional impairment to the vehicle's operation, the Miller court held that the plaintiff had not supported his claim. Id. Defendant argues that Plaintiff's evidence does not constitute a nonconformity because he only complains about a vibration, not a functional impairment of the vehicle. Furthermore, Defendant argues that the vibration is actually a normal characteristic of the Vehicle, and as such cannot constitute a defect under the warranty and hence cannot constitute a nonconformity. (Def. Mot. Summ. J. p. 11-12, R. at 17.)

In response, Plaintiff argues that the vibration can constitute a nonconformity because it impacts the Vehicle's value, and because it can damage the Vehicle's powertrain, engine, or driveshaft. (Pl. Mem. Opp'n. p. 14, R. at 23.) As to the vibration's impact on the Vehicle's value, Plaintiff relies on his deposition testimony. Plaintiff testified that the vibration affects the Vehicle's value because, if he ever tried to sell it, he would have to disclose the existence of the vibration "[a]nd instead of giving me the right price of the [V]ehicle, [the buyer] would negotiate with me." (Abulella Dep. p. 49.) This testimony, however, is insufficient to create a genuine issue of material fact as to whether the vibration substantially impairs the value of the Vehicle. See R.C. § 1345.71(E). No reasonable finder of fact could conclude, based solely on Plaintiff's speculation about the price he could get for the Vehicle if he attempted to resell it, that the vibration substantially impaired the Vehicle's value and thus constituted a nonconformity. Plaintiff's arguments as to the Vehicle's value do not establish the existence of a genuine issue for trial. See Tollett, 128 F.3d at 422.

Plaintiff, however, also argues that the vibration will damage major components of the Vehicle, which would substantially impair the use of the Vehicle. (Pl. Mem. Opp'n. p. 16-17, R.

at 23.) Plaintiff relies on the Vehicle Inspection Report, deposition testimony, and affidavit of his expert witness, Gerald Smolak ("Smolak"). Smolak inspected the Vehicle on February 1, 2007 and prepared a Vehicle Inspection Report on April 10, 2007. The purpose of this inspection was "to attempt to find evidence that would shed light on the cause of the alleged behavior [the vibration] of the subject vehicle." (Vehicle Inspection Report p. 1, Gerald Smolak Dep. ex. B, R. at 16-3 ("Vehicle Inspection Report").) Smolak performed a visual inspection and driving tests, and verified the existence of the vibration. Smolak described the vibration as "significant," and stated that it left a tingling sensation in his fingers. (Id.) Smolak concluded: "the repairs performed for warranty purposes have not been done in a thorough and satisfactory manner. There are numerous repair procedures that have not been performed and or have not been documented with their results if they were performed." (Id. p. 2.) The Vehicle Inspection Report criticized the way that Germain replaced the drive shaft center support bearing on Plaintiff's second repair visit to Germain. (Repair Order, Def. Mot. Summ. J. ex. C., R. at 17.) Additionally, at his deposition in August 2007, Smolak testified that, in his opinion, the vibration was caused by bad engine mounts. (Smolak Dep. p. 35, R. at 16-3.)

Later, in January 2008, Smolak prepared an affidavit that was attached to Plaintiff's response to Defendant's Motion for Summary Judgment. Smolak's affidavit repeats the majority of his Vehicle Inspection Report and deposition testimony, but adds Smolak's conclusion that the vibration, "if not eliminated, will affect the longevity of and cause damage to the major powertrain components which are the engine, the transmission, the propeller shaft and the differential." (Smolak Aff. ¶ 41, Pl. Mem. Opp'n. ex. B., R. at 23 ("Smolak Aff.").) Smolak's affidavit also noted that, after he inspected the Vehicle, Defendant issued a technical services bulletin to its authorized

11

dealers which notes that "S Class 4-Matic" model vehicles have been the subject of customer complaints of vibrations, and that installing optimized engine mounts will resolve the problem. (Technical Service Bulletin, Smolak Aff. ex. 3, Pl. Mem. Opp'n. ex. B., R. at 23.) Smolak stated that the engine mounts on Plaintiff's Vehicle had not been replaced. (Smolak Aff. ¶ 42.)

Defendant objects to Plaintiff's reliance on Smolak's affidavit, however, because Defendant contends that the affidavit expands the scope of his original expert report and contradicts his deposition testimony. Defendant points out that, at his deposition, Smolak stated that the Vehicle Investigation Report "was an accurate copy of all the opinions that [he had] with respect to the [V]ehicle[.]" (Smolak Dep. p. 27.) Defendant then argues that Smolak's failure to offer an opinion, either in his Vehicle Investigation Report or deposition testimony, as to what the long-term consequences of the vibration may be indicates that Smolak's affidavit contradicts his prior statements. Defendant cites no law for this argument, however, and the Court does not find it persuasive.

The Sixth Circuit has made it clear that a post-deposition affidavit should be stricken only if it *directly contradicts* prior sworn testimony, or if it constitutes an attempt to create a sham factual issue. <u>Aerel, S.R.L. v. PCC Airfoils, L.L.C.</u>, 448 F.3d 899, 908 (6th Cir. 2006). Smolak's statements about the long-term impact of the vibration in his affidavit do not directly contradict his statements in either the Vehicle Investigation Report or his deposition testimony, because he was never asked to provide an opinion about the long-term consequences of the vibration. The purpose of the Vehicle Investigation Report was to discover the cause of the vibration, not offer an opinion on the long-term consequences of the vibration (Vehicle Investigation Report p. 1), and at the deposition Defendant never asked Smolak to opine as to the long-term consequences of the

12

vibration. "[T]he deponent is under no obligation to volunteer information not fairly sought by the questioner," Aerel, 448 F.3d at 907, and Plaintiff should not be punished for Smolak's failure to discuss the consequences of the vibration when Defendant never asked Smolak to do so. Furthermore, Smolak's statements are not an attempt to create a sham factual issue, because they were submitted to rebut Defendant's reliance on Miller and Defendant's arguments that vibration, without evidence of impairment of other mechanical functions, cannot constitute a defect. Smolak's affidavit may properly be considered on summary judgment.

Viewed in the light most favorable to the Plaintiff, there is a genuine issue of material fact as to whether the vibration constitutes a nonconformity. Smolak stated at his deposition and in his affidavit that the engine mounts on Plaintiff's Vehicle were faulty, and were causing the vibration. (Smolak Dep. p. 35; Smolak Aff. ¶ 42.) These statements are reinforced by the technical service bulletin issued by Defendant, which states that vibration complaints may be resolved by installing optimized engine mounts. Although Defendant points out that this bulletin states that it applies to four wheel drive S550s and that Plaintiff owned a two wheel drive S550 (Def. Reply p. 5, R. at 25), the bulletin describes Plaintiff's vibration exactly, and it is unclear on the evidence presented that the fact that the bulletin was addressed to four wheel drive vehicles automatically means that it is not relevant to two wheel drive vehicles. While the repair order from Plaintiff's second visit to Germain indicates that the engine mounts were "reset" (Repair Order, Def. Mot. Summ. J. ex. C., R. at 17), this does not contradict Smolak's assertion that the engine mounts were never replaced. Additionally, Smolak testified that the vibration, if it continued, could damage or destroy some of the Vehicle's major mechanical components. A reasonable finder of fact, based on this evidence, could certainly conclude that the vibration was a defect that substantially impaired the use, value,

or safety of the Vehicle.

Defendant's arguments that the vibration was a normal characteristic of the S550 model are unavailing, because the question is not whether the Vehicle conformed to other S550s: the question is whether the Vehicle conformed to the *warranty*. If the brakes of every single vehicle of a particular model failed, for instance, that would still constitute a defect and nonconformity if the brakes were warranted not to fail. Whether the Vehicle was warranted to be free of vibrations is a question of fact not properly resolved on summary judgment. Although Defendant has presented Romans' testimony that the vibration was a normal characteristic of the Vehicle, Plaintiff has countered with his own expert's testimony that such vibrations do not belong in the Vehicle. (Smolak Dep. p. 32-34.) The Court cannot weigh this testimony and resolve the issue on summary judgment. See Anderson, 477 U.S. at 249.

Plaintiff has also established that Defendant was given a reasonable number of attempts to repair the Vehicle, because the Vehicle was subject to repair for substantially the same alleged nonconformity, the vibration, three or more times during the first year of ownership. R.C. § 1345.73. Summary judgment is not appropriate on Plaintiff's Nonconforming New Motor Vehicle Law claim, because there is a genuine issue as to whether the vibration constitutes a nonconformity.

### B.     Magnuson-Moss Warranty Act and Breach of Warranties

The elements of an Ohio breach of warranty claim are identical to the elements of a Magnuson-Moss Warranty Act claim, and so the Court will address these claims together. See, e.g., Malkamaki v. Sea Ray Boats, Inc., 411 F.Supp.2d 737, 743 (N.D. Ohio 2005). To state a claim for a violation of the Magnuson-Moss Warranty Act or breach of warranty, the plaintiff must show that "(i) the item at issue was subject to a warranty; (ii) the item did not conform to the warranty; (iii)

14

the seller was given reasonable opportunity to cure any defects; and (iv) the seller failed to cure the defects within a reasonable time or a reasonable number of attempts." Temple v. Fleetwood Enterprises, Inc., 133 F.App'x. 254, 268 (6th Cir. 2005). "[T]he applicability of the Magnuson-Moss Act is directly dependant upon a sustainable [state law] claim for breach of warranty. Thus, if there exists no actionable warranty claim, there can be no violation of the Magnuson-Moss Act." Id. (internal citations omitted).

### 1. Implied Warranty

Plaintiff has alleged that Defendant breached an implied warranty. (Compl. ¶¶ 1-10, R. at 3.) Defendant argues, however, that this claim must fail because Plaintiff and Defendant were not in privity of contract. (Def. Mot. Summ. J. p. 6, R. at 17.)

"In Ohio, purchasers of automobiles may assert a contract claim for breach of implied warranty of merchantability, pursuant to the Magnuson-Moss Warranty Act, only against parties with whom they are in privity of contract. . . . [P]rivity exists only between immediate links in the distribution chain." Curl v. Volkswagen of America, Inc., 114 Ohio St. 3d 266, 272-73, 871 N.E.2d 1141 (2007). Plaintiff argues that "privity of contract is not required for a contractual claim for an action in tort for breach of implied warranty" (Pl. Mem. Opp'n. p. 11, R. at 23), and cites to C.W. Zumbiel Co. v. Reichhold Chemicals, Inc., No. C-950644, 1996 WL 400501 (Ohio App. 1st Dist. June 5, 1996). This argument, however, was squarely rejected by the Ohio Supreme Court in Curl:

> [L]ongstanding Ohio jurisprudence provides that purchasers of automobiles may assert a contract claim for breach of implied warranty only against parties with whom they are in privity. . . . A claim for breach of implied warranty, though similar to a tort action, arises pursuant to the law of sales codified in Ohio's Uniform Commercial Code. The privity requirement . . . allows sellers of goods to define their scope of responsibility and provides a greater degree of foreseeability regarding potential claimants. . . . To permit a claimant to recover without establishing vertical privity blurs the distinction between contract and tort.

Curl, 114 Ohio St. 3d at 271-72.  Thus, Plaintiff must establish privity between himself and Defendant to succeed on an implied warranty claim.

In this case, Defendant did not directly sell the Vehicle to Plaintiff.  Rather, Plaintiff bought the Vehicle from an intermediary, Germain.  (Compl. ¶ 1, R. at 3.)  Plaintiff is in privity with Germain, but not with Defendant.  This lack of privity between Plaintiff and Defendant dooms Plaintiff's implied warranty claim.  Curl, 114 Ohio St. 3d at 272.  Furthermore, because there is no actionable state law implied warranty claim, there can be no Magnuson-Moss Warranty Act claim based on an implied warranty.  Temple, 133 F.App'x. at 268.

### 2. Express Warranty

Plaintiff, however, does not need to establish privity between himself and Defendant to bring a Magnuson-Moss Warranty Act claim based on breach of an express warranty.  Plaintiff received an express warranty from Defendant when he purchased the Vehicle.  (Pl. Mem. Opp'n. p. 6, R. at 23.)  Although claims under the Magnuson-Moss Warranty Act and the Nonconforming New Motor Vehicle Law are not identical, and establishing a claim under one does not automatically establish a claim under the other, see, e.g., Iams, __ N.E.2d at __, 2007 WL 4373237 at *12, for the same reasons as discussed above in section III.A. there is a genuine issue as to the material fact of whether the Vehicle conformed to Defendant's warranty, and Defendant had a reasonable opportunity to repair the alleged defect.  Summary judgment is not appropriate on this claim.

### C. Consumer Sales Practices Act

Ohio's Consumer Sales Practices Act, OHIO REV. CODE ANN. § 1345.01 et seq. (LexisNexis 2006) prohibits unfair or deceptive consumer sales practices.  Section 1345.02(A) states: "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer

16

transaction." For the Consumer Sales Practices Act to apply, there must be a consumer transaction. Section 1345.01(A) defines a "consumer transaction" as "a sale, lease, assignment, award by chance, or other transfer of an item of goods . . . to an individual for purposes that are primarily personal, family, or household . . . ."

Defendant argues that the Consumer Sales Practices Act does not apply to Plaintiff's purchase of the Vehicle, because Plaintiff did not use the Vehicle for primarily personal uses. (Def. Mot. Summ. J. p. 14, R. at 17.) Plaintiff claimed the Vehicle on Ultimax's tax returns, and Plaintiff testified that he considered the Vehicle a business vehicle. (Abulella Dep. p. 16-17.) Plaintiff did not use the Vehicle for "primarily personal" purposes. Additionally, Ultimax is listed on the purchase order, not Plaintiff, which would indicate that the sale was not "to an individual" either. See Culbreath v. Golding Ents, L.L.C., 114 Ohio St. 3d 357, 362-63, 872 N.E.2d 284 (2007) (fax sent to plaintiff's law firm did not fall within the Consumer Sales Practices Act because the law firm is not an "individual" for the purposes of the statute).

Plaintiff "concede[s] the intended mixed use of the [V]ehicle which was for business and for personal reasons. . . . The use is about 50-50." (Pl. Mem. Opp'n. p. 17, R. at 23.) The Court concludes that the sale of the Vehicle was not to an individual, and was not for purposes that are primarily personal. Thus, the sale of the Vehicle was not a consumer transaction, and summary judgment for Defendant is appropriate on this claim.

### D. Deceptive Trade Practices Act

Ohio's Deceptive Trade Practices Act, OHIO REV. CODE ANN. §§ 4165.01-4165.04 (LexisNexis 2006), similar to the Consumer Sales Practices Act, prohibits unfair or deceptive trade practices. The Deceptive Trade Practices Act, in pertinent part, states:

17

>A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:
>
>* * *
>
>>(7)  Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have . . . ;
>
>* * *
>
>>(9)  Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another[.]

R.C. § 4165.02(A).

>To state a claim under the Deceptive Trade Practices Act, a plaintiff must show that:
>
>(1) the defendant has made false or misleading statements of fact concerning his own product or another's; (2) the statement deceives or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived customer's purchasing decisions; (4) the [statements] were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff.

HER, Inc. v. RE/MAX First Choice, LLC, 468 F.Supp.2d 964, 979 (S.D. Ohio 2007). In order for the Deceptive Trade Practices Act to be implicated, there must be a representation that the goods sold had certain characteristics or qualities that they did not have. See Mafcote, Inc. v. Genatt Associates, Inc., No. 1:04-cv-853 , 2007 WL 527870 *11 (S.D. Ohio Feb. 14, 2007) (holding that plaintiff's claim failed as a matter of law when plaintiff could not identify any specific representations made by defendant).

Defendant argues that Plaintiff cannot identify any specific representations Defendant made about the Vehicle's characteristics or quality. (Def. Mot. Summ. J. p. 15-16, R. at 17.) Defendant points to the following testimony from Plaintiff's deposition:

18

> Q. [W]hat type of driving was [the Vehicle] represented to provide?
>
> A. Smooth.
>
> Q. Who represented that?
>
> A. That's a common . . . Some things there are no questions about.
>
> * * *
>
> Q. What level of comfort and luxury were you promised?
>
> A. Well, nobody promised me any luxury.

(Abulella Dep. p. 39-40.) Defendant argues that Plaintiff's Deceptive Trade Practices Act claim is based entirely on Plaintiff's assumptions about the Vehicle, and that Plaintiff has "wholly failed to establish that [Defendant] made any claims or representations that it knew to be false." (Def. Mot. Summ. J. p. 16, R. at 17.)

Plaintiff responds by simply stating that the Deceptive Trade Practices Act "has been violated by [D]efendant, or at [least] there exist questions of material fact in that regard which are the same as those recited in the previous sections of this memorandum . . . ." (Pl. Mem. Opp'n. p. 19, R. at 23.) Presumably, Plaintiff is referring to his arguments concerning the existence of a defect in the Vehicle. But regardless of whether there is or is not a defect in the Vehicle, Plaintiff must establish that Defendant made a *representation* that the Vehicle had qualities or characteristics it did not have in order to establish a claim under the Deceptive Trade Practices Act. See Mafcote, 2007 WL 527870 at *11. Defendant's warranty was not a false or misleading statement that there were no defects in the Vehicle; it was a contractual promise that, if a defect did in fact exist, Defendant would repair it. Even if the warranty could be considered a representation, however, Plaintiff has not presented any evidence relating to the other four factors of his claim, as outlined above. There

19

is no evidence that the statements in the warranty would "tend to deceive" a substantial part of a hypothetical audience, or that the statements in the warranty influenced Plaintiff's purchasing decision. See HER, 468 F.Supp.2d at 979. Summary judgment is appropriate for Defendant on this claim.

**IV.     Conclusion**

For the above reasons, Defendant's Motion for Summary Judgment (R. at 17) is **GRANTED** as to Plaintiff's claims for violation of the Magnuson-Moss Warranty Act based on breach of implied warranty, violation of the Consumer Sales Practices Act, and violation of the Deceptive Trade Practices Act. Defendant's Motion is **DENIED**, however, as to Plaintiff's claims for violation of the Magnuson-Moss Warranty Act based on breach of express warranty, and violation of the Nonconforming New Motor Vehicle Law.

**IT IS SO ORDERED**.


Date: April 8, 2008                                                **/s/ John D. Holschuh**
                                                                   John D. Holschuh, Judge
                                                                   United States District Court